UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-30248-MAP

RUGGERS, INC.,                          )
                 Plaintiff        )
v.                                      )     PLAINTIFF'S MEMORANDUM
                                 )     IN OPPOSITION TO
DHL EXPRESS (USA), INC.,                )     MOTION TO DISMISS
                 Defendant       )

The plaintiff, Ruggers, Inc., submits this memorandum in opposition to defendant DHL Express (USA), Inc.'s ("DHL") Motion to Dismiss.  By its motion, DHL asserts that the dispute alleged is governed by the Warsaw Convention, that the Warsaw Convention preempts Ruggers' claims as stated, and that the action should be dismissed because "it appears that the plaintiff can prove no set of facts in support of the claim that would entitle [it] to relief." Defendant's Memorandum, at p. 2.

## MEMORANDUM

As set forth below, the motion should be denied because 1) the Warsaw Convention does not apply since the destruction by DHL of Ruggers' goods a) did not occur during any "transportation by air" and b) in any event was the result of "willful misconduct" by DHL; 2) even if the Warsaw Convention applies it does not "preempt" Ruggers' claims but establishes limits and conditions with respect to those claims; and 3) if amendment of Ruggers' complaint is necessary, leave should be freely given to do so.

A.       <u>Allegations of the Complaint</u>

As DHL acknowledges, dismissal under Rule 12 (b)(6) of the Federal Rule of Civil Procedure is appropriate only where it appears beyond doubt that plaintiff can prove no set of facts that would entitle it to relief.  <u>Analog Devices, Inc. v. Allied Van Lines, Inc.</u>, 1996 U.S.

Dist. LEXIS 5649, 1996 WL 208463 at *3 (D. Mass. 1996) (copy attached). This is true even if "plaintiff has demanded relief according to an inappropriate theory." Id.

For purposes of a motion to dismiss for failure to state a claim, the complaint is viewed in the light most favorable to the party opposing the motion, and its allegations are taken as true. Id., citing Miree v. DeKelb County, Georgia, 433 U.S. 25 (1977); Scheur v. Rhodes, 416 U.S. 232 (1974).

Ruggers alleges here that after transporting from Hong Kong to New York a shipment of 470 rugby shirts intended for delivery ultimately to West Springfield, Massachusetts, DHL held that shipment in a guarded facility in New York while Ruggers sought an appropriate visa made necessary by DHL's misapplication of a visa previously, but then rerouted that shipment to Hong Kong and deliberately destroyed the rugby shirts at some unknown facility there in early 2003. Complaint, ¶¶ 6-17.

Ruggers' allegations properly state the basis for claims for relief, and DHL's motion should be denied for the reasons described below.

    B.    Argument

        1.    The Warsaw Convention Does Not Apply To Ruggers' Claims.

For either or both of two distinct reasons, the Warsaw Convention on which DHL relies in seeking dismissal does not apply. First, DHL did not destroy Ruggers' shipment during "transportation by air" as the Warsaw Convention requires in order that the Convention apply. Second, the deliberate destruction of that shipment constituted "willful misconduct" as a result of which the Warsaw Convention by its own terms does not apply.

a.    <u>DHL's destruction of Ruggers' goods was not done during DHL's "transportation by air."</u>

The Warsaw Convention, fully named <u>The Convention for the Unification of Certain Rules Pertaining To International Transportations By Air</u>, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934), reprinted at note fall 49 U.S.C. §40105, is an international treaty governing claims arising from international air transportation.  <u>See</u> <u>generally</u> <u>Vaughn v. American Auto. Assoc.</u>, Inc., 326 F. Supp. 2d 195, 198-99 (D. Mass. 2004).  Article 18 of the Convention states a presumption of liability in certain circumstances:

(1)    The carrier shall be liable for damage sustained in the event of the destruction or . . . damage to, any . . . goods, if the occurrence which caused the damage so sustained took place during the transportation by air.

(2)    The transportation by air . . . shall comprise the period during which the baggage or goods are in charge of the carrier, whether in an airport or on board an aircraft, or in the case of a landing outside an airport, in any place whatsoever.

(3)    The period of the transportation by air shall not extend to any transportation by land, by sea, or by river performed outside an airport.  If, however, such transportation takes place in the performance of a contract for transportation by air, for the purpose of loading, delivery or transshipment, any damage is presumed, subject to proof to the contrary, to have been the result of an event that took place during the transportation by air.

Warsaw Convention, Art. 18

Thus, the Warsaw Convention will apply to claims for damage or destruction of goods only when it occurred during "transportation by air" from one signatory nation to another.  <u>See</u> <u>Quantime Corp. v. W. J. Donovan, Inc.</u>, 1988 U.S. Dist. LEXIS 4027 at *10, ___ WL ___at (D. Mass 1988) (copy attached).

Ruggers acknowledges that the period of "transportation by air" may extend beyond the period during which cargo is literally in flight or even on board an aircraft.  Thus, for example, as DHL cites, cases have appropriately deemed "transportation by air" to include incidental warehousing on airport grounds between or after flights.  <u>See</u> <u>Bennett Importing Co. v.</u>

Continental Airlines, Inc., 1998 WL 34031677 (copy attached).  See also, e.g., Banihashemrad v. Lufthansa Cargo AG, 28 F. Supp. 2d 1014 (W.D. Tex 1998) (rugs kept in airport warehouse for one day until customs cleared remained in "transportation by air").

Such cases are inapposite here, however.  Here, first of all, plaintiff alleges a marked deviation from any planned or agreed itinerary for the shipment.  Numerous cases have held that a carrier may not avail itself of the Warsaw Convention's limitations on liability or other provisions where the damage to goods occurred at a location not included as an "agreed stopping place" on the waybill or planned itinerary for the shipment.  See, e.g., Intercargo Ins. Co. v. China Airlines, Ltd., 208 F3d 63 (2d Cir. 2000) (in order for carrier to invoke Warsaw Convention, waybill must contain all agreed stopping places of shipment); Mitsui Marine & Fire Ins. Co. v. China Airlines, Ltd., 101 F. Supp. 2d 216 (S.D.N.Y. 2000) (air carrier's failure to list all agreed stopping places on waybill, either explicitly or through incorporation by reference, precluded it from benefiting from limitation of liability for damage sustained to cargo at unlisted location); Sotheby's v. Federal Express Corp., 97 F. Supp. 2d 491 (S.D.N.Y. 2000) (carrier -- who added Memphis as a stopping place when, in transporting artwork from England to New Jersey, it sent artwork from New Jersey to Tennessee and back because of staff shortage and failed to list Memphis on waybill -- precluded from reliance on Warsaw Convention).

While the complaint does not allege the contents of any waybill or any specific flight itinerary, it is a fair implication from the facts alleged that there was no waybill for the return of the goods to Hong Kong for destruction, as Ruggers ultimately sought their release from New York.  Complaint, ¶¶ 9-17.

Further, there is no allegation or evidence that DHL's destruction of Ruggers' goods occurred at or even near an airport or otherwise during "transportation by air".[1]  This case might come to a different result if the goods were accidentally damaged or destroyed as they sat in DHL's guarded warehouse at JFK in New York, for example.  They were not, however.  Instead, DHL unilaterally and apparently without inclusion of that destination on a waybill deemed Hong Kong to be the goods' final destination and destroyed them there after transportation had terminated.  Complaint, ¶ 17.

Thus, the allegations of the Complaint do not establish that DHL destroyed Ruggers' goods during "transportation by air" so that the Warsaw Convention controls, and there is no basis for any presumption that this is what occurred.  The motion to dismiss should therefore be denied.

        b.     <u>DHL's Destruction of Ruggers' Goods Constitutes "Willful Misconduct" Such That The Warsaw Convention Does Not Apply.</u>

The Warsaw Convention is intended as a means of dealing uniformly with disputes arising out of accidental occurrences that result in damage to or destruction of goods (or personal injuries) during international air transport.  Warsaw Convention, Arts. 17-18.  By its terms, it does not apply to claims of willful misconduct.  Article 25(1) of the Convention provides:

> The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his willful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to willful misconduct.

Warsaw Convention, Art. 25(1).

---

[1] To the extent factual determinations are necessary to decide issues such as the contents of any relevant waybill or the location of the facility at which the goods were destroyed, and therefore determine the applicability of the Warsaw Convention, initial discovery in this action could be limited to such issues, if appropriate.

The acts of DHL alleged here are acts committed willfully.  This is not a case where, as in cases relied upon by DHL, goods were inexplicitly lost, or stolen, or damaged while in transit or incidental storage.  Rather, this is a case in which DHL deliberately destroyed at its own facilities in Hong Kong a shipment of rugby shirts which had <u>previously</u> been transported by air.  Complaint, ¶ 17.  The Warsaw Convention does not apply to such instances of willful misconduct.  Convention Art. 25(1).  For purposes of Article 25, willful misconduct occurs "where an act or omission is taken with knowledge that the act probably will result in injury or damage….." <u>Royal Insurance v. Amerfood Dinerland AirCargo</u>, 654 F. Supp. 679, 684 (S.D.N.Y. 1987), quoting <u>Maschinen Fabrik Kern v. Northwest Airlines, Inc.</u>, 562 F. Supp. 232, 240 (N.D. Il). 1983).  By definition, DHL's deliberate destruction of the rugby shirts was known to result in the loss of those shirts.  This was no "accident" to which the Warsaw Convention might apply.

> 2.     <u>Even If The Warsaw Convention Applied, It Would Not Supplant Ruggers' Claims But Merely Subject Them To The Conditions And Limits Of The Convention</u>.

As set forth above, DHL is not entitled to avail itself of the provisions of the Warsaw Convention.  Even if that were not the case, however, dismissal of plaintiff's alleged claims would be inappropriate because the Warsaw Convention does not truly preempt common law or statutory claims; it merely renders them subject to the conditions and limitations of the Convention.

Article 24 of the Convention, the provision nearest to any form of preemptive provision, says:

> In the cases covered by articles 18 and 19 any action for damages, **however founded**, can only be brought **subject to the conditions and limits set out in this Convention**.

6

Warsaw Convention, Art. 24(1) (emphasis added).  Compare, e.g., Airline Deregulation Act, 49 U.S.C. § 1305(a) ("no state…shall enact or enforce any law…relating to rates, routes or services…)

The Convention does not proscribe any particular cause of action against a carrier, but only provides for a presumption of liability and a series of conditions and limitations on available relief.  Thus, a judge of this Court has properly held in the context of internationally transported goods lost during incidental storage (a case relied upon by defendant) that "[p]laintiff's state law claims … can only be maintained subject to the conditions and limits outlined in the Warsaw Convention."  Bennett Importing, supra, 1998 WL 34031697 at *3 (D. Mass. 1998) (Keeton, J.), citing In re Mexico City Aircrash, 708 F. 2d 400, 414 n. 25 (9th Cir. 1983).

The Warsaw Convention does not apply here.  Even if it did, however, it would not preempt or supplant Ruggers' claim, only potentially limit them.  DHL's motion to dismiss should be denied.

3.    If An Amendment Of The Complaint Is Deemed Necessary, Leave To Amend Should Be Freely Given.

Even if the Court were to determine that the Warsaw Convention applied to this dispute, and applied in such a way as to preclude the statement of claims for breach of contract, negligence and violation of Mass. G.L. c. 93A as alleged,[2] Ruggers is not left without a remedy on the facts alleged.  To accept DHL's argument is to conclude that the properly alleged facts of Ruggers' complaint alleges destruction of property which occurred during "transportation by air" between signatories of the Warsaw Convention, such that a claim under the Warsaw Convention (and only a claim under that Convention) may be asserted.  If the Court does so

---

[2] Ruggers intends to amend the Complaint to allege an additional claim for conversion.

conclude, leave to amend to expressly state such a claim should be freely granted.  See Analog Devices, Inc. v. Allied Van Lines, Inc., 1996 WL 208463 at *4 (plaintiff's motion to dismiss preempted state law claims denied without prejudice provided that by date certain plaintiff files amended complaint under Carmack Amendment) (copy attached).

CONCLUSION

For all of the foregoing reasons, DHL's Motion to Dismiss should be denied.

REQUEST FOR HEARING

Plaintiff Ruggers, Inc. hereby requests a hearing on the motion opposed by this memorandum.

> The Plaintiff
> RUGGERS, INC.
> By Its Attorneys:
>
>
> /s/ Kevin C. Maynard_____
> Kevin C. Maynard
>   BBO No. 550669
> Bulkley, Richardson and Gelinas, LLP
> 1500 Main Street, Suite 2700
> Springfield, MA  01115-5507
> Tel.: (413)  272-6244/Fax: (413) 272-6804

January 19, 2005

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by first class mail on January 19, 2005.

> /s/ Kevin C. Maynard_____
> Kevin C. Maynard

Westlaw.

Not Reported in F.Supp.
1996 WL 208463 (D.Mass.)
(Cite as: 1996 WL 208463 (D.Mass.))

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Massachusetts.

**ANALOG DEVICES**, INC., plaintiff,
v.
**ALLIED VAN LINES**, INC., defendant.

**Civ. A. No. 95-10879-MLW.**

March 21, 1996.

*MEMORANDUM AND ORDER*

WOLF, District Judge:

**\*1** Allied Van Lines ("Allied"), defendant, moves to dismiss the claims brought by plaintiff, Analog Devices, Inc. ("Analog") for damage to property which allegedly occurred during interstate transport by the defendant under a bill of lading. Analog sued Allied under common law theories of negligence, breach of contract, and bailment. Allied contends that the claims must be dismissed because they are preempted by the Interstate Commerce Act and the Carmack Amendment. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 and 49 U.S.C. § 10521, *et seq.* For the reasons set forth below Allied's Motion to Dismiss is being denied.

I. FACTS

The facts set forth in Analog's Complaint are as follows. On or about August 30, 1991, Analog contracted with Allied for the shipment of certain inventory from its facility in Greensboro, North Carolina to its facility in Santa Clara, California. Complaint, par. 5. The contract for shipment was evidenced by Allied's Bill of Lading, number 1073797, dated August 30, 1991. *Id.* at par. 6. According to Analog, the inventory was under the exclusive control of the defendant during shipping. The inventory was delivered to its destination in California, and the plaintiff subsequently became aware that certain shipped inventory, specifically a "Model 340-HT Analyzer", and several "Thermco

Furnaces", had been damaged. *Id.* at par. 8.

II. DISCUSSION

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) must be granted when it appears beyond doubt that the plaintiff can prove no set of facts that would entitle that party to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). Generally, the motion must be evaluated based on the sufficiency of the pleadings. *Mahone v. Addicks Utility Dist. of Harris County,* 836 F.2d 921, 935 (5th Cir. 1988). Courts are reluctant to grant a motion to dismiss for failure to state a claim. 5A Wright & Miller, *Federal Practice and Procedure,* § 1357 (1990). Thus, for purposes of the motion to dismiss, the complaint is construed in the light most favorable to the party opposing the motion, and its allegations are taken as true. *Miree v. Dekalb County, Georgia,* 433 U.S. 25 (1977); *Scheuer v. Rhodes,* 416 U.S. 232 (1974). A complaint will survive a motion to dismiss for failure to state a claim if it conforms with Federal Rule of Civil Procedure 8(a) by setting out a generalized statement of facts. 5A Wright & Miller, § 1357. This is a liberal standard, requiring only enough information to allow the defendant to be able to frame a responsive pleading. *See Dewey v. University of New Hampshire,* 694 F.2d 1, 3 (1st Cir. 1982), *cert. denied,* 461 U.S. 944 (1983). Since Analog has alleged sufficient facts to state a claim upon which relief can be granted, Allied's motion to dismiss must fail.

Analog's Complaint requests relief for Allied's negligence in shipping property which was in its exclusive control and for breaching a valid shipping agreement. Allied contends that the plaintiff's action was improperly brought under these common law theories because the claim is preempted by the Carmack Amendment to the Interstate Commerce Act.

**\*2** Allied is correct in its assertion that the claim is governed by the Carmack Amendment [FN1]. The Carmack Amendment applies to common carriers "providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under subchapter I, II, or IV of chapter 105 of [Title 49]". 49 U.S.C. § 11707(1)(a). Chapter 105 of Title 49 provides in pertinent part:
Subject to this chapter and other law, the Interstate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 208463 (D.Mass.)
(Cite as: 1996 WL 208463 (D.Mass.))

Commerce Commission has jurisdiction over transportation by motor carrier and the procurement of that transportation... to the extent that passengers, property, or both, are transported by motor carrier (1) between a place in (A) a State and a place in another State.

In the present case, the plaintiff's property was transported between one state and another by Allied, which is a common carrier [FN2]. Allied's Motion to Dismiss, par. 2. Thus, the claim is governed by the Interstate Commerce Act and the Carmack Amendment.

Moreover, Allied is correct in its assertion that Analog's common law claims are preempted by the Carmack Amendment.

Federal law preempts state and common law when Congress expressly provides that the federal law supplants state authority in a particular field, or when its intent to do so may be inferred from a pervasive system of regulation which does not leave a sufficient vacancy within which any state can act.

*Shao v. Link Cargo Limited,* 986 F.2d 700, 704 (4th Cir. 1993) (citing *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218 (1947)). Preemption may also be inferred where state legislation would impede the purposes and objectives of legislation enacted by Congress. *See Hillsborough County v. Automated Medical Lab., Inc.,* 471 U.S. 707 (1985).

The Carmack Amendment was enacted in 1906 as an amendment to the Interstate Commerce Act of 1887 and addresses the liability of common carriers for goods lost or damaged during a shipment over which the Interstate Commerce Commission has jurisdiction. *Shao, 986 F.2d at 704.* The Amendment requires, among other things, that a carrier transporting property issue a bill of lading or a receipt to the shipper, and makes the carrier liable to the one entitled to recover under the bill of lading or the receipt for loss of or injury to the property. This Amendment was intended by Congress to create a national uniform policy regarding the liability of carriers under a bill of lading for goods lost or damaged in shipment. *Adams Express Co. v. Croninger,* 226 U.S. 491 (1913). In *Adams Express Co. v. Croninger,* the Supreme Court explained:

Almost every detail of the subject [of the liability of a carrier under a bill of lading] is covered so completely by [the Carmack Amendment] that there can be no rational doubt but that Congress intended to take possession of the subject and supersede all state regulation with reference to it.... *Id.* at 505-50; *See also New York, New Haven &*

*Hartford R.R. v. Nothnagle,* 346 U.S. 128, 131 (1953); *Atchison, Topeka & Santa Fe Ry. v. Harold,* 241 U.S. 371 (1916). Consequently, allowing a shipper to bring common law breach of contract or negligence claims against a carrier for damage to goods shipped interstate under a valid bill of lading conflicts with this policy. *Shao, 986 F.2d at 706.* Since the Carmack Amendment applies to the present action, Analog's common law claims are preempted.

*3 However, Analog's failure to bring this action under the Carmack Amendment does not warrant dismissal of the claims. *See, e.g., Mid America Title Co. v. Kirk,* 991 F.2d 417 (7th Cir. 1993), *cert. denied,* 114 S.Ct. 346 (1993) (incorrect legal theory is not fatal to a complaint). A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) must be granted when it appears beyond doubt that the plaintiff can prove no set of facts that would entitle that party to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46. There is no requirement that the claim properly identify the legal theory under which the plaintiff intends to proceed. On the contrary, "a complaint is sufficient against a motion to dismiss, if it appears from the complaint that a plaintiff may be entitled to *any* form of relief". 5 Wright & Miller, § 1219 (emphasis added). This hold true even if the plaintiff has demanded relief according to an inappropriate theory. *Id.* (citing *Newman v. Silver,* 713 F.2d 14, 15 FN.1 (2d Cir. 1983)).

In *Fitzgerald v. Codex Corporation,* 882 F.2d 586 (1st Cir. 1989), the First Circuit reversed a district court order dismissing a case on grounds that the plaintiff's claims were preempted by the Employee Retirement Income Security Act (ERISA). In that case, the plaintiff filed a complaint in the Superior Court for the Commonwealth of Massachusetts alleging tort and contract claims against his former employer for wrongful discharge. The defendant removed the case to the United States District Court for the District of Massachusetts asserting that the claims were preempted by federal ERISA laws. In addition, the defendant moved to dismiss on grounds that ERISA preempted the plaintiff's common law claims and that, under ERISA, the complaint failed to state a claim upon which relief could be granted. The district court held that ERISA did preempt the plaintiff's common law claims and, therefore, removal was proper. Moreover, the court dismissed the case because the claims were preempted. *Id.* at 589.

However, on appeal the First Circuit reversed the district court, holding:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 208463 (D.Mass.)
(Cite as: 1996 WL 208463 (D.Mass.))

[t]he fact that the field has been preempted does not necessarily indicate that under Fed.R.Civ.P. 12(b)(6) a complaint fails to state a claim upon which relief can be granted.

*Id.* at 589. The First Circuit reasoned that

[t]he "theory of the pleadings" doctrine, under which a complaint must proceed upon some definite theory and plaintiff must succeed on that theory or not suceed at all, has been all but abolished under the federal rules.

*Id.* (citing Wright & Miller, 5 *Federal Practice & Procedure,* § 1219 (1969)). Rather, all that is necessary, under Fed. R. Civ. P. 8, is that the plaintiff set forth "sufficient factual allegations to state a claim showing that he is entitled to relief under some viable legal theory". *Id.; see also Rahler v. TRW, Inc.,* 576 F.2d 1260, 1264 (7th Cir. 1978); *In re Plywood Antitrust Litigation,* 655 F.2d 627, 641 (5th Cir. 1981). Furthermore, the First Circuit held that the plaintiff had alleged sufficient facts to state a claim under ERISA, despite the fact that he stated them in support of preempted common law claims. *Fitzgerald,* 882 F.2d at 589.

**\*4** Similarly, although Analog's common law claims are preempted by the federal law, this action is not being dismissed because the facts alleged state a claim under the Carmack Amendment. More specifically, since the facts set forth in the complaint describe damage to property which allegedly occurred during interstate shipment by a common carrier and covered by a bill of lading, the complaint is sufficient to state a claim upon which relief can be granted under the Carmack Amendment.

III. CONCLUSION

For the foregoing reasons the plaintiff's motion to dismiss is hereby DENIED without prejudice, provided that, by April 5, 1996, plaintiff files an amended complaint under the Carmack Amendment. In addition, it is hereby ORDERED that a scheduling conference shall be held on May 22, 1996 at 2:30 p.m.

FN1. Originally part of the Hepburn Act, ch. 3591, 34 Stat. 584 (1906), and codified at 49 U.S.C. § 20(11), the Carmack Amendment has been recodified at 49 U.S.C. § 11707.

FN2. According to § 10102 of Title 49, "common carrier" means, among other things, "a person holding itself out to the general public to provide motor vehicle

transportation for compensation...", or "a person holding itself out to the general public...to provide transportation of property for compensation and in the ordinary course of its business: (B) assumes responsibility for the transportation from the place of receipt to the place of destination...."

1996 WL 208463 (D.Mass.)

**Motions, Pleadings and Filings (Back to top)**
•          1:95CV10879                (Docket)
(Apr. 28, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
1998 WL 34031697 (D.Mass.)
**(Cite as: 1998 WL 34031697 (D.Mass.))**

Page 1

Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.

**BENNETT IMPORTING** Company, Plaintiff
v.
**CONTINENTAL AIRLINES**, INC., Defendant

**No. Civ.A. NO. 87 CV 29.**

Dec. 27, 1998.

Sullivan and Lynch, Boston, MA., for Bennett
Importing Com.

Ethan Warren, Needham & Warren, Boston, MA.,
for Continental Airlines, Inc.

KEETON, J.

**\*1** This case was tried before the court without a jury
on November 23, 1988. The parties agreed to a
bifurcated trial, with Phase I limited to liability. The
parties further agreed, with the court's approval, that
all direct testimony would be received by affidavit
rather than oral examination. No oral examination
was conducted for the purpose of cross-examination.
This Opinion recites the court's findings and
conclusions on all issues material to disposition in
this Phase I trial.

I.

Plaintiff, Bennett Importing Company ("Bennett")
asserts two counts against defendant Continental
Airlines Incorporated ("Continental") for failing to
deliver, in a timely fashion, a shipment of goods
under Air Waybill No. 005- 2293-0574 to plaintiff or
plaintiff's agents. Jurisdiction is based on diversity of
citizenship. _28 U.S.C. § 1332._

The essential facts are not in dispute.

On July 13, 1987, Continental received in
Guadalajara, Mexico from Huaramex, S.A. as
consignor, 21 pieces of freight labelled "leather
shoes" for delivery to John F. Kennedy International
Airport ("JFK") in New York. The consignee is listed
on the Air Waybill as "Terra Is Incorporated"

("Terra"). This shipment arrived in New York on July
15, 1987, and was placed in Continental's bonded
cargo facility. On July 16, 1987, a carrier's certificate
to the Bureau of Customs issued indicating Terra as
consignee, Continental as the carrier, Alto
Customhouse Brokers, Inc. ("Alto") as the "broker"
and Camel Trucking as the trucking company
authorized to pickup the goods. Bennett is not listed
on this document. Plaintiff's Exhibit 1.

On July 20, 1987, United States Customs issued an
authorization for release of the goods to Alto.
Plaintiff's Exhibit 6. Bennett is listed on this
document, although it is unclear from the copy
received in evidence whether Bennett is listed on the
document as the "consignee." However, plaintiff
agreed at trial that this document was never
forwarded to Continental.

On July 22, 1987, Continental was paid in full for
the shipment.

On July 24, 1987, Alto mailed a preliminary claim
for "damage/storage" of the goods to Continental.
The claim indicated that the shipment was missing.
Plaintiff's Exhibit 3. Bennett is listed on the
document as a party to whom acknowledgement of
"receipt of this claim" should be given. The letter also
states that "[a] formal claim will be submitted by the
importer when the loss has been fully ascertained."
Plaintiff's Exhibit 3.

On July 30, 1987, Bennett sent a formal claim for
loss to Continental.

On August 1, 1987 Camel Trucking took possession
of the shipment from Continental.

On August 8, 1987, Continental received the claim
for loss dated July 30, 1987. In this claim, Bennett
identified damages of $ 23,397 .25 which included
the entire value of the missing shipment plus the
entire value of a shipment that was received but could
not allegedly be used without the missing shipment.
No damages were requested due to "delay."

**\*2** No other claim for loss was ever made on
Continental. On November 10, 1987, Bennett filed
suit in state court for lose due to delay of the
shipment, claiming damages over $ 80,000.00.
Continental removed the case to this court.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1998 WL 34031697 (D.Mass.)
**(Cite as: 1998 WL 34031697 (D.Mass.))**

II.

The dispute in this case is essentially one for breach of contract, or breach of a carrier's duty to deliver goods on time. However, because the goods were shipped internationally, from Mexico into the United States, any claim for loss or injury to the goods is subject to the provisions of the Warsaw Convention if the dispute arises out of actions that took place during the "transportation by air." *49 U.S.C. § 1502, Article 18.*

Article 18 defines "transportation by air" as "the period during which the baggage or goods are in charge of the carrier, whether in an airport or on board an aircraft...." Defendant's Second Affirmative Defense--that Bennett lacks standing to sue because it is not named on the face of the Air Waybill-- is premised on a ruling that the provisions of the Warsaw Convention are applicable to this dispute. This ruling is in turn based on a finding that the damage in this case occurred during the period of "transportation by air."

Courts that have interpreted and applied Article 18 have held that whether the loss occurred during transportation by air is determined by the amount of control the carrier exercised over the goods, the place of the loss, and whether the loss occurred during a period of incidental and temporary storage of goods. See *Royal Ins. v. Amerford Air Cargo, 654 F.Supp. 679 (S.D.N.Y.1987); Berman v. Trans World Airlines, 101 Misc.2d 511, 421 N.Y.S.2d 291, 193 (1979).*

At trial, the parties submitted affidavits and presented evidence bearing on the issue of whether Continental retained control of the goods at the time the loss occurred. In its supplemental affidavit on behalf of Continental, defendant states that when cargo arrives at JFK.

it is immediately placed in storage in Continental's facilities at the airport. The cargo remains there until delivered to the consignee or local transportation company. All customs inspections are done at Continental's facilities. The cargo is not placed in the custody of the consignee or its agent for customs purposes.

Thus, defendant argues that the period of transportation by air began when the goods were placed with the carrier in Mexico, and continued until the consignee or a designated trucking company picked up the goods from Continental at JFK.

Pursuant to Fed.R.Civ.P. 52, plaintiff proposed four findings of fact, three of which relate to when the period of transportation by air was terminated. Plaintiff's first proposed finding on this issue is that upon placement of the cargo in the customs bonded cargo facility of Continental, the period of transportation by air terminated. Such a finding, however, would be contrary to the weight of authority on this issue and inconsistent with the plain meaning of Article 18 in which the relevant criterion is whether the carrier is in charge of the goods.

**\*3** Continental had a duty to place the goods in its bonded facility upon arrival at JFK. It could not have completed performance of its obligation as an air carrier without storing the goods for some time period after arrival at JFK. There is no indication either in the documentary evidence or affidavit testimony that Continental forfeited any control over the cargo when it was placed in the bonded facility. Accordingly, I cannot accept plaintiff's proposed finding that the transportation by air terminated on July 16, 1987.

Plaintiff's second proposed finding on this issue is that the relevant period terminated upon issuance of the carrier's certificate. Issuance of the carrier's certificate, however, in no way changes the place of the goods or control over the goods. Issuance of the carrier's certificate is standard procedure. It allows the customs service to begin inspection of the goods. Although plaintiff may be correct that the issuance of the carrier's certificate transferred title over the goods from Continental to Terra, no evidence was presented to support a finding that issuance of the carrier's certificate altered the degree of control Continental exercised over the goods. Thus, I cannot accept plaintiff's proposed finding that the period of transportation by air terminated on July 16, 1987.

Plaintiff's final proposed finding on this issue is that the period of transportation by air ceased upon authorization by the customs service that the goods could be released. No evidence was presented, however, to support a finding that the authorization divested Continental of control over the goods, or that it altered, in any way, the placement of or custody over the goods.

The Warsaw Convention includes provisions for damages in the event of loss, damage or delay. In this case, plaintiff's claim is for failure to deliver on time and thus is a claim for damages due to delay. Implicit in a provision that awards damages for delay is the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1998 WL 34031697 (D.Mass.)
**(Cite as: 1998 WL 34031697 (D.Mass.))**

assumption that the Warsaw Convention would be applicable in cases in which the cargo was not delivered on time because the cargo was temporarily lost or in transit, but where the receiving party had taken all necessary steps to accept the cargo. Plaintiff has presented no evidence to support a ruling that under circumstances in which the goods are temporarily lost but are nevertheless retained by the carrier, the Warsaw Convention would no longer be applicable. Accordingly I conclude that the period of transportation by air includes the time during which the goods were retained by Continental after importation into the United States, and before release to Camel Trucking. Storage of the goods for the limited purpose of obtaining release from customs, and then delivering them to the authorized agent, is incidental to the contract to transport the goods from Mexico into the United States. Therefore, because I find that the loss occurred during this period of incidental storage, I conclude that the provisions of the Warsaw Convention are applicable to this dispute. Plaintiff's state law claims therefore, can only be maintained subject to the conditions and limits outlined in the Warsaw Convention. *In re Mexico City Aircrash, 708 F.2d 400, 414 n. 25 (9th Cir.1983)*.

### III.

**\*4** Article 14 of the Warsaw Convention states that "the consignor and the consignee can respectively enforce all the rights given to them by articles 12 and 13, each in his own name whether he is acting in his own interest or in the interest of another...." Defendant contends that pursuant to this provision, the only entities or persons with standing to sue for damage, loss, or delay that occurred during the period of transportation by air are those entities or persons listed on the face of the Air Waybill either as consignor or consignee.

The Ninth Circuit recently addressed this issue in *Johnson v. American Airlines, Inc., 834 F.2d 721, 724-25 (9th Cir.1987)*. In Johnson the court explicitly held that "only the consignor and consignee to the air waybill have standing to sue under the Convention." Id. However, the court explicitly declined to reach the question of whether the plaintiffs would have standing to sue based on "an agency or third-party beneficiary status." Id.

In *Leon Bernstein Commercial Corp. v. Pan American World Airways, 72 A.D.2d 707, 421 N.Y.S.2d 587* (1979 1st Dept), the court held that an alleged undisclosed principal of the consignor named

in the air waybill could have standing to sue the carrier if it could be established upon trial that the plaintiff was the undisclosed principal and had title to the goods at the time of the loss. Thus, the plaintiff had the burden of proving that it was the undisclosed principal of the consignor and therefore could sue the carrier.

Under both Massachusetts and New York law an undisclosed principal may sue, or be sued for damages arising out of a contract entered into by the agent and a third party. However, under both Massachusetts and New York law, the burden of proving the existence of the agency relationship is on the party seeking to establish that an agency relationship exists. E.g., *Taub v. Colonial Coated Textile Corp., 54 A.D.2d 660, 387 N.Y.S.2d 869, 870* (1976 1st Dept); *Armen Z. Nalbandian v. Hanson Restaurant & Lounge, Inc., 369 Mass. 150, 338 N.E.2d 335 (1975)* (holding that in order to sue an undisclosed principal it is well-settled that the plaintiff had to prove the existence of the agency relationship).

Throughout plaintiff's submissions are references to both Terra and Alto as "agents" for Bennett. However, in plaintiff's statement of facts in its Brief in Opposition to Motion for Summary Judgment (Docket No. 11), plaintiff refers to Terra as the consignor's freight forwarder. Alto, on the other hand is referred to as plaintiff's "agent." Plaintiff's mere allegation that Terra is an agent of Bennett cannot support a ruling that Bennett was an undisclosed principal entitled to sue on the contract (Air Waybill). If it is Plaintiff's contention that Bennett is the undisclosed principal of Terra (the named consignee on the Air Waybill), it was incumbent upon plaintiff to provide the court with evidence of the alleged agency relationship at trial.

**\*5** It is well-settled that a person who contracts to perform an act for another, but who is not a fiduciary for the "other," is an independent contractor, not an agent. See RESTATEMENT (SECOND) AGENCY § 14 comment o (1958). The distinction between an agent and an independent contractor is not a mere formality. The agency relationship carries with it duties, rights, and implications for third parties. For example, a principal may be subject to liability upon contracts made by an agent acting within the agent's authority. Thus, if Terra had violated the contract with Continental, Continental would have been entitled to sue Bennett as an undisclosed principal.

Plaintiff, however, did not produce evidence

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1998 WL 34031697 (D.Mass.)
(Cite as: 1998 WL 34031697 (D.Mass.))

sufficient to establish an agency relationship between itself and Terra. No evidence was produced, for example, with regard to how Terra was paid, what services Terra performed, or how Terra transferred title over the goods to Bennett. Moreover, plaintiff did not produce any affidavits from either Terra or Alto stating that they were acting as "agents" for Bennett, or that Bennett was suing on their behalf. In addition, Bennett has not made a claim that it was the intended beneficiary of the contract between Huamarex, S.A. and Terra, or that it has rights that derive from the contract between Huamarex, S .A. and Terra.

Plaintiff's evidence bearing on whether an agency relationship existed is limited to the Affidavit on Behalf of Bennett Importing Company in which plaintiff states that "Bennett's agent, Terra Is Incorporated, a freight forwarder, coordinated the transportation of the merchandise from Guadalajara, Mexico to New York," the fact that Bennett eventually received the goods shipped, and that Bennett and Huamarex, S.A. had entered into a contract for the sale of the goods. Although this evidence supports a finding that Bennett was the party to whom the goods were eventually to be delivered, it does not support a finding that Terra was Bennett's agent. Thus, I reject plaintiff's first proposed finding of fact, to wit: "Bennett Importing Company is the consignee of the import shipment."

Neither is there documentary evidence or affidavit testimony before the court that purports to prove that continental knew or should have known that Terra was acting as Bennett's agent. Plaintiff admitted at trial that although the document authorizing release from customs included Bennett's name, that document was never forwarded to Continental. It is also undisputed that the first time Bennett made any claim for loss on Continental was its July 30, 1987 letter to Continental. Although Alto states in its July 24 letter that the "importer" would present a formal claim for loss, and included Bennett's name as a party to whom recognition of the claim should be sent, there was no indication in that letter that Terra was Bennett's agent.

Although plaintiff produced evidence that for a previous and related shipment Bennett was named on the Air Waybill as consignee, this evidence fails to support a finding that Continental knew that Terra was acting as Bennett's agent. The previous Air Waybill does not reference Terra, but rather includes Alto's name as the entity to be contacted when the goods arrived at JFK. In addition, Plaintiff produced

no evidence of other prior dealings that could establish that Continental knew or should have known that Terra was acting as Bennett's agent. Therefore, I cannot find that Bennett has standing to sue based on Continental's knowledge that Terra was an agent for Bennett.

IV.

**\*6** Even if I had concluded in Part III that plaintiff does have standing to sue, either as a third party beneficiary or on an agency theory, I conclude that plaintiff is barred from suing because Bennett failed to comply with the applicable notice provisions of the Warsaw Convention.

Article 26 of the Warsaw Convention requires a complainant alleging loss due to delay to notify the carrier in writing "at the latest within 14 days from the date on which the baggage or goods were placed at his disposal." *49 U.S.C. § 1502,* Article 26(2). Article 26(4) states that if a complainant fails to comply with subparagraph 2, "no action shall lie against the carrier, save in the case of fraud on his part." Defendant argues that Bennett failed to comply with the 14 day notice requirement, despite Bennett's latter to Continental dated July 30, 1987 in which Bennett states "please consider this our formal claim for loss of the entire shipment ... please acknowledge receipt of this claim and please expedite settlement of same." Plaintiff's Exhibit 4. Defendant does not contend that Bennett never notified Continental of loss of the entire shipment. Rather, defendant argues that because the entire shipment was delivered on August 1, 1988, and because the letter when received by Continental on August 8, 1988 claimed damages for loss rather than for delay, Bennett failed to comply with its obligation to notify the carrier of any damages due to delay.

Defendant argues that the notice provisions can be waived only in the exceptional case where the damage to the cargo was so obvious that notification would have been superfluous. E.g., *Dalton v. Delta Airlines, Inc., 570 F.2d 1244 (5th Cir.1978)* (holding that where the goods shipped were live greyhounds, and where the greyhounds when delivered were dead, no notification of the damage to the carrier was required). In this case, however, the question is not whether Bennett is entitled to be excepted from the notice requirements, but rather, whether Bennett's letter of July 30 and/or the letter from Alto on July 24, satisfy the notice requirements.

Continental delivered the cargo to Camel Trucking

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1998 WL 34031697 (D.Mass.)
**(Cite as: 1998 WL 34031697 (D.Mass.))**

on August 1, 1987. It received the letter from Bennett claiming damages for loss of the entire shipment on August 8, 1987. The letter cited "loss" because at that time, on July 30, no goods were delivered. Consequently, when the letter pre-dating the delivery date was received on August 8, 1987, it was reasonable for Continental to assume that there was no damage from the delay. If the letter to Continental had been dated after the goods were delivered, then it would be reasonable to find that Continental was on notice that Bennett had a claim against it. However, because the letter pre-dated delivery, and because Continental had cured the loss by the time it received the letter, it was reasonable for Continental to ignore the claim for loss, take no action toward settlement, and fail to investigate whether Continental was at fault for the loss. Thus, although Bennett's July 30 letter asks Continental to expedite settlement of the claim, it does so referencing only the loss of the entire shipment. Once this loss was cured, it was incumbent upon Bennett, pursuant to Article 26(2) to notify Continental of any damages due to delay. This Bennett failed to do. Because the Warsaw Convention is explicit that compliance with the notice provisions is a prerequisite to suit, I must rule that Bennett is barred from suing Continental for damages due to delay.

V.

**\*7** For the reasons stated in Parts III and IV of this Memorandum, I conclude that under Articles 14 and 26(4) of the Warsaw Convention, judgment must be for the defendant.

Final judgment for defendant on all counts, with costs, will be entered forthwith.

Robert E. Keeton

United States District Judge

Final Judgment

December 27, 1988

For the reasons stated in the Opinion of this date, it is ORDERED:

Judgment for defendant with costs.

Robert E. Keeton

United States District Judge

1998 WL 34031697 (D.Mass.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:04-cv-30248-RGS    Document 7-2    Filed 01/19/2005    Page 9 of 16

Get a Document - by Citation - 1988 U.S. Dist. LEXIS 4027                    Page 1 of 8

Service: **Get by LEXSEE®**
Citation: **1988 usdistlexis 4027**

*1988 U.S. Dist. LEXIS 4027, \**

Quantime Corporation, Plaintiff, v. W. J. Donovan Inc., D/B/A Donovan-Mayflower, and Aero
Mayflower Transit Company, Inc., and Emery Air Freight, Inc., Defendants

Civil Action No. 86-1415-N

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

1988 U.S. Dist. LEXIS 4027

May 3, 1988

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff purchaser brought an action against defendants,
carrier and air carrier, under the Carmack Amendment, 49 U.S.C.S. § 11707, for loss of
a computer disk drive.

**OVERVIEW:** The purchaser ordered the drive for resale and delivery to a customer in
Italy. The seller hired the carrier to deliver the equipment to the air carrier. The
purchaser asked the air carrier to hold the drive until it could provide an export license.
The carriers provided evidence that the disk drive was delivered to the air carrier. When
the drive was not delivered to Italy, the purchaser wrote a letter to the claims
department. The air carrier refused the claim, stating that it had no record of receiving
the drive. The carrier and air carrier contended that the claims were time-barred. The
purchaser argued that the carrier was put on notice when it inquired as to the location of
the drive. The purchaser sought to avoid the time limitations as to the air carrier by
arguing that it acted as a warehouseman. The court granted a judgment in favor of the
carriers. The purchaser did not provide written notice to the carrier of its claim until it
commenced the suit, after the period for filing a claim expired. The inquiries did not
qualify as filing a written claim, and the drive was delivered the air carrier. The
purchaser hired the air carrier to transport and not to store goods.

**OUTCOME:** The court granted a judgment in favor of the carrier and air carrier in the
action brought by the purchaser.

**CORE TERMS:** disk drive, carrier, transportation, shipment, bill of lading, air, delivery,
storage, air carrier, signature, warehouseman, indirect, export license, customer, notice,
wick, convention, tariff, statute of limitations, written notice, destination, consignee,
contacted, shipping, aircraft, driver, limitations period, arbitrariness, two-year, baggage

### **LexisNexis(R) Headnotes** ♦ Hide Headnotes

Transportation Law > Carrier Duties & Liabilities
Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally
*HN1* ± 49 U.S.C.S. § 11707(e) provides that a carrier may not provide by rule, contract,
or otherwise, a period of less than nine months for filing a claim against it under
this section and a period of less than two years for bringing a civil action against it
under this section. The period for bringing a civil action is computed from the date
the carrier gives a person written notice that the carrier has disallowed any part of

Case 3:04-cv-30248-RGS   Document 7-2   Filed 01/19/2005   Page 10 of 16

Get a Document - by Citation - 1988 U.S. Dist. LEXIS 4027                                    Page 2 of 8

the claim specified in the notice.   More Like This Headnote

Transportation Law > Carrier Duties & Liabilities > Rates & Tariffs 🔒
Governments > Legislation > Statutes of Limitations > Time Limitations 🔒
*HN2*⊥ If a claim is not brought within the time specified by the relevant tariff, a
subsequent action for damages under 49 U.S.C.S. § 11707 is
barred.   More Like This Headnote

Transportation Law > Carrier Duties & Liabilities > Damages & Reparation 🔒
Governments > Legislation > Statutes of Limitations > Time Limitations 🔒
*HN3*⊥ Mere knowledge of damage or loss is not enough to toll the time requirement. Even
direct oral notice of claim will not suffice.   More Like This Headnote

International Law > Dispute Resolution > Liability Determinations 🔒
*HN4*⊥ Article I of the Warsaw Convention states in part that (1) the convention shall apply
to all international transportation of goods performed by aircraft for hire. (2) For
the purposes of the convention the expression "international transportation" shall
mean any transportation in which, according to the contract made by the parties,
the place of departure and the place of destination are situated within the
territories of two High Contracting Parties.   More Like This Headnote

Transportation Law > Air Transportation > Personal Injury & Property Damage 🔒
*HN5*⊥ Article 18(1) of the Warsaw Convention provides that an air carrier will be liable for
damage sustained in the event of the loss of any goods, if the occurrence which
caused the damage so sustained took place during the transportation by air. The
term "transportation by air" is a term of art and is defined as follows: the
transportation by air within the meaning of the preceding paragraph shall comprise
the period during which the baggage or goods are in charge of the carrier, whether
in an airport or on board an aircraft.   More Like This Headnote

Transportation Law > Air Transportation
*HN6*⊥ Air carrier means any citizen of the United States who undertakes, whether directly
or indirectly or by a lease or any other arrangement to engage in air
transportation.   More Like This Headnote

Transportation Law > Air Transportation > Personal Injury & Property Damage 🔒
Governments > Legislation > Statutes of Limitations > Time Limitations 🔒
*HN7*⊥ Article 29 of the Warsaw Convention establishes a statute of limitations for claims
for damages for loss: (1) the right to damages shall be extinguished if an action is
not brought within two years, reckoned from the date of arrival at the destination,
or from the date on which the aircraft ought to have arrived, or from the date on
which the transportation stopped. (2) The method of calculating the period of
limitation shall be determined by the law of the court to which the case is
submitted.   More Like This Headnote

Transportation Law > Air Transportation > Prices, Routes & Services 🔒
*HN8*⊥ Where customers engage carrier to ship goods by air, any storage is temporary and
incidental and does not indicate that the carrier is a
warehouseman.   More Like This Headnote

Transportation Law > Air Transportation > Personal Injury & Property Damage 🔒
Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally 🔒
*HN9*⊥ Under the Warsaw Convention, the statute of limitations begins to run from the

Case 3:04-cv-30248-RGS    Document 7-2    Filed 01/19/2005    Page 11 of 16

Get a Document - by Citation - 1988 U.S. Dist. LEXIS 4027                    Page 3 of 8

date on which the transportation stopped or the shipment should have arrived, and is calculated according to the law of the court to which it is submitted. More Like This Headnote

Transportation Law > Air Transportation > Personal Injury & Property Damage 🔍
Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally 🔍
HN10⊥ At the latest, the limitations period in the Warsaw Convention begins to run once a party with enforceable rights under a carriage contract knows or has reason to know something has gone wrong with the shipment, be it misdelivery, loss or delay. More Like This Headnote

**COUNSEL:** **[*1]**

Ansel B. Chaplin, for Plaintiff.

Michael C. Lehane, Esq., Emery Air Freight: Stephen C. Fulton, Esq. for Defendant.

**OPINIONBY:** SARIS, Magistrate

**OPINION:** FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER RE: ENTRY OF JUDGMENT

PATTI B. SARIS, United States Magistrate

This action involves the loss of a computer disk drive which was supposed to be transported from Salem, New Hampshire, to Milan, Italy. The parties consented to trial before a United States Magistrate, and the trial was held on March 21, 1988. Valerie Griffin, the corporate secretary/office manager of the plaintiff Quantime Corporation ("Quantime"), testified on behalf of (Quantime), and William R. Mottla, the director of operations of Donovan-Mayflower, testified on behalf of defendants W. J. Donovan, Inc. and Aero Mayflower Transit Company, Inc. ("Donovan"). No witnesses testified on behalf of defendant Emery Air Freight, Inc. ("Emery").

After a review of the evidence, the pleadings and the stipulated facts, the Court orders entry of judgment on behalf of defendants on the ground that the claims are time-barred.

FINDINGS OF FACT

In October, 1983, Quantime ordered a computer disk drive from Digital Equipment Corporation ("DEC") for **[*2]** resale and delivery to a Quantime customer in Milan, Italy. DEC hired Donovan to transport and deliver the equipment to Emery at Emery's facility at Logan Airport in East Boston, Massachusetts.

In December, 1983, William Springer, then a vice-president of Quantime, contacted Larry Wick of Emery, and arranged that Emery would receive a number of items of computer equipment, including the disk drive, from DEC for shipment to its overseas customers. He asked Wick to hold the disk drive at Emery's facility at Logan Airport until he could provide an export license for its shipment to Milan, Italy.

On January 3, 1984, DEC delivered the disk drive to Donovan in Salem, New Hampshire. The Donovan bill of lading acknowledged receipt of the disk drive from DEC, with the carrier signature of "T. J. Bailey," on January 3, 1984. The disk drive was stored in a Donovan facility in Westboro, Massachusetts, until January 5, 1984. According to Mottla, the normal procedure for delivery of DEC goods was that the computer parts would be delivered to the

Case 3:04-cv-30248-RGS    Document 7-2    Filed 01/19/2005    Page 12 of 16

Get a Document - by Citation - 1988 U.S. Dist. LEXIS 4027                    Page 4 of 8

Donovan Westboro facility and then delivered to the consignee on the next day or following day.

The Donovan records indicate that the computer disk, which **[*3]** had the carrier number 283-4285, was delivered to Emery on January 5, 1984. The bill of lading carries the handwritten notation, "Revd. 1 Ctn 1/5/84 J Mily." The signature, "Mily," is not fully legible. The daily log of driver Bill Tocco indicates that he delivered "283-4285" from the "DEC account" to East Boston at 10:10 a.m. and departed at 10:20 a.m. The consignee on the DEC Bill of Lading was listed as "Quantime--Emery Wor[1]dwide Terminal--Export Dept/Attn: Larry Wick--Logan Intl Airport--East Boston Ma 02128." It was standard operating procedure for the driver to obtain the signatures of those receiving the goods on the bottom of the bills of lading.

Although no evidence was ever introduced concerning the identity of the person who signed the bill of lading, Donovan's records are persuasive evidence that the disk drive was delivered to Emery on January 5, 1984.

On February 23, 1984, Springer wrote a letter to Wick, which stated in relevant part:

Late last December when you handled a shipment to London for me there was a second shipment to Italy of a DEC disk drive which was delivered to you but I asked you to hold it as I did not have the necessary paperwork from Italy, its **[*4]** destination, to apply for an Export License.

You mentioned in early January that there would be no storage charges if the drive were there for just a few weeks. I never thought it would be there this long. I would like to know the following

-what are the storages to date?

-what is the rate to continue to store it for another month or two?

-what are the estimated freight charges to Milan, Italy.

Springer never received a response to the letter. According to the stipulation of the parties, "Mr. Springer would testify that as a result, sometime later, probably around April, 1984, he called Emery to further inquire. Emery was unable to locate any records pertaining to the . . . disk drive."

Springer then contacted DEC. DEC in turn contacted Donovan, obtained a copy of DEC's bill of lading, and on July 30, 1984, forwarded a copy of this bill of lading to Springer. On August 6, 1984, Springer wrote a letter to the claims department of Emery, which stated in relevant part:

In January, 1984 your office at Logan Airport in Boston received a Disk Drive (RA81) from Digital Equipment Corporation to be shipped, for us, to Italy. We asked you to hold the shipment until we received **[*5]** the Export Certificate. In February, I wrote the attached letter to Larry Wick to which I received no response.

About April, as a result of conversations with John Walker it became apparent that you did not have the disk in question! I requested proof of delivery to you from DEC and just the other day received the attached delivery receipt.

The value of the disk drive is $ 14,378.80. By this letter, we wish to make a claim to Emery for this amount. (Emphasis added.)

Case 3:04-cv-30248-RGS    Document 7-2    Filed 01/19/2005    Page 13 of 16

Get a Document - by Citation - 1988 U.S. Dist. LEXIS 4027                    Page 5 of 8

On November 6, 1984, Emery sent Springer a letter refusing to honor the claim on the grounds that its "personnel at the Boston terminal have no record of receiving this shipment," and the signatures on the invoice could not be identified as being the signatures of Emery employees.

On November 7, 1984, Paul Barney of DEC spoke to Linda Miller of Donovan, about the "status of the equipment"; on November 8, 1984, Miller forwarded to Barney a certified copy of DEC's bill of lading.

At no time prior to the commencement of this lawsuit did Quantime provide written notice to Donovan of its loss or claim.

The disk drive was never delivered to the intended customer in Italy.

The initial complaint named only Donovan as a **[*6]** defendant and was filed on May 6, 1986. Later, on May 22, 1986, and again on August 28, 1986, plaintiff filed amended complaints which did not name Emery as a defendant. On October 28, 1986, plaintiff filed a third amended complaint which named Emery as a co-defendant.

QUANTIME'S CLAIM AGAINST DONOVAN

The claim for the loss of property has been brought under 49 U.S.C. § 11707, frequently termed the Carmack Amendment, which governs the liability of common carriers under bills of lading. *HN1* Section 11707(e) provides:

A carrier may not provide by rule, contract, or otherwise, a period of less than 9 months for filing a claim against it under this section and a period of less than 2 years for bringing a civil action against it under this section. The period for bringing a civil action is computed from the date the carrier gives a person written notice that the carrier has disallowed any part of the claim specified in the notice.

The parties agree that, at all material times, the shipment of the disk drive was subject to I.C.C. HGB-400-B. Item 19(a) provides that a claim for loss will not be voluntarily paid by a carrier unless filed in writing within the specified time limits. Item **[*7]** 19(b) outlines the minimum filing requirements as follows:

A communication in writing from a claimant filed with carrier within the time limits specified in the bill of lading or contract of carriage or transportation and (i) containing facts sufficient to identify the shipment (or shipments) of property involved, (ii) asserting liability for alleged loss, damage, injury, or delay, and (iii) making claim for the payment of a specified or determinable amount of money, will be considered as sufficient compliance with the provisions for filing claims embraced in the bill of lading or other contract of carriage.

Item 19(k) specifies the time limit for filing claims as follows:

As a condition precedent to recovery, a claim for any loss, damage, injury, or delay, must be filed in writing with carrier within nine (9) months after delivery to consignee as shown on bill of lading, or in case of failure to make delivery, then within nine (9) months after a reasonable time for delivery has elapsed; and suit must be instituted against carrier within two (2) years and one (1) day from the date when notice in writing is given by carrier to the claimant that carrier has disallowed the claim **[*8]** or any part or parts thereof specified in the notice. Where a claim is not filed or suit is not instituted thereon in accordance with the foregoing provisions, carrier will not be liable and such claim will not be paid.

*HN2* If a claim is not brought within the time specified by the relevant tariff, a subsequent action for damages under § 11707 is barred. Calpro Co. v. Consol. Engineering Co. of

Case 3:04-cv-30248-RGS    Document 7-2    Filed 01/19/2005    Page 14 of 16

Get a Document - by Citation - 1988 U.S. Dist. LEXIS 4027                              Page 6 of 8

Georgia, 502 F. Supp. 707, 711 (N.D. Ga.1980). See also Culver v. Boat Transit, Inc., 782 F.2d 1467, 1469 (9th Cir. 1986); Ryder Truck Lines, Inc. v. Consolidated Rail Corp., 580 F. Supp. 22, 23-24 (N.D. Ill. 1984).

Quantime did not provide written notice to Donovan of its claim until it commenced this lawsuit on May 6, 1986. Therefore, the nine-month period for filing a claim established by the applicable tariff and statute was violated. Quantime contends, however, that DEC placed Donovan on notice of the loss when it sought copies of its bill of lading some time prior to July 30, 1984 and again on November 7, 1984, and inquired into the status of the equipment. Even assuming that DEC's oral inquiry was made within nine months after a reasonable time for delivery had elapsed, these **[*9]** inquiries do not meet the minimum requirement for filing a written claim established by Item 19 of the tariff.

Moreover, it is established that <sup>HN3</sup> mere knowledge of damage or loss is not enough to toll the time requirement. See Calpro Co. v. Consol. Engineering Co. of Georgia, 502 F. Supp. at 712. See also Perini-North River Associates v. Chesapeake & Ohio Railway Co., 562 F.2d 269, 273 (3d Cir. 1977). Even direct oral notice of claim will not suffice. Penn State Laundry Co. v. Pennsylvania Railroad Co., 134 F. Supp. 955, 956-57 (W.D. Pa. 1955).

Finally, even assuming Quantime's claim were timely, Donovan has introduced sufficient evidence, particularly the bill of lading and the daily log of its driver, to establish that it delivered the disk drive to co-defendant Emery. Therefore, the Court finds that on the merits, plaintiff cannot prevail on its claim against Donovan.

QUANTIME'S CLAIM AGAINST EMERY

Emery argues that Quantime's claim is barred by the two year limitations period established under the provisions of the Convention for Unification of Certain Rules relating to International Transportation by Air, frequently termed the "Warsaw Convention" (reprinted after **[*10]** 49 U.S.C. § 1502).

<sup>HN4</sup> Article I of the Warsaw Convention states in pertinent part:

(1) This convention shall apply to all international transportation of . . . goods performed by aircraft for hire. . . .

(2) For the purposes of this convention the expression "international transportation" shall mean any transportation in which, according to the contract made by the parties, the place of departure and the place of destination . . . are situated . . . within the territories of two High Contracting Parties. . . .

There is no dispute that the transportation by air of the disk drive from Boston, Massachusetts, USA to Milan, Italy, would have been covered by the Warsaw Convention, and the parties stipulate that Emery is an indirect air carrier under the Federal Aviation Act of 1958, 49 U.S.C. § 1301(3). n1 <sup>HN5</sup> Article 18(1) of the Warsaw Convention provides that an air carrier will be "liable for damage sustained in the event of the . . . loss of . . . any goods, if the occurrence which caused the damage so sustained took place during the transportation by air." The term "transportation by air" is a term of art and is defined as follows: "The transportation by air within the meaning of the **[*11]** preceding paragraph shall comprise the period during which the baggage or goods are in charge of the carrier, whether in an airport or on board an aircraft. . . ." Article 18(2) (emphasis added).

n1 <sup>HN6</sup>"'Air carrier' means any citizen of the United States who undertakes, whether directly

Case 3:04-cv-30248-RGS    Document 7-2    Filed 01/19/2005    Page 15 of 16

Get a Document - by Citation - 1988 U.S. Dist. LEXIS 4027                    Page 7 of 8

or indirectly or by a lease or any other arrangement to engage in air transportation. . . ." See also <u>14 C.F.R. § 296.1(e)</u> (definition of indirect air carrier).

*HN7*☆Article 29 establishes a statute of limitations for claims for damages for loss:

(1) The right to damages shall be extinguished if an action is not brought within 2 years, reckoned from the date of arrival at the destination, or from the date on which the aircraft ought to have arrived, or from the date on which the transportation stopped.

(2) The method of calculating the period of limitation shall be determined by the law of the court to which the case is submitted.

This article "clearly provides that an action brought pursuant to the Warsaw Convention must be commenced within two years." <u>Data General Corp. v. Air Exp. Intern. Co., 676 F. Supp. 538, 539 (S.D.N.Y. 1988).</u>

Plaintiff seeks to avoid the two-year statute of limitations **[*12]** by arguing that Emery was acting as a warehouseman--not an indirect air carrier--when the loss occurred. Cf. <u>Mass. Gen. L. ch. 105, § 1</u> (a warehouseman is an entity "engaged in the business of storing goods for hire"). However, the evidence introduced at trial conclusively demonstrates that Quantime hired Emery to transport the disk drive by air to Milan, Italy, and not to store the goods.

On its purchase order to DEC, Quantime specified as shipping instructions: "Shipping and forwarding agents are Emery--Production London to confirm shipping route--Delivery should be Free Domicile Milan--on 'economy service rates'." In the February 23, 1984 letter, Springer wrote to Larry Wick of Emery's Export Department concerning a "second shipment to Italy of a DEC disk drive which was delivered to you but I asked you to hold it as I did not have the necessary paper work from Italy, its destination, to apply for an Export License"; in the letter, Springer noted, "You mentioned in early January that there would be no storage charges if the drive were there for just a few weeks." (Emphasis added.) Finally, on August 6, 1984, Springer again wrote Emery: "In January, 1984, your office at **[*13]** Logan Airport in Boston received a Disk Drive (RA81) from Digital Equipment Corporation to be shipped, for us, to Italy." (Emphasis added.) This evidence establishes that, at the time Emery received the disk drive, both parties intended that Emery would be acting in the capacity as an indirect air carrier, and to the extent the disk drive was stored, the storage at the airport was incidental to the transportation by air.

Although on February 23, 1984 Quantime was making inquiries concerning storage costs because of the length of time necessary to obtain the export license, there is no evidence that the parties had modified their contractual arrangements in such a way that Emery was acting as a warehouseman at the time of the loss. See <u>Royal Insurance v. Amerford Air Cargo, 654 F. Supp. 679, 681 (S.D.N.Y. 1987)</u> *HN8*☆(where customers engage carrier to ship goods by air, any storage is "temporary and incidental" and does not indicate that the carrier is a warehouseman); Cf. <u>Berman v. Trans World Airlines, 421 N.Y.S. 2d 291, 293 (1979)</u> (in determining whether a loss of baggage occurred during "transportation by air," the court must determine the degree of control of the carrier; **[*14]** the location of the loss; and "the activity the party was engaged in at the time of the accident").

*HN9*☆Under the Warsaw Convention, the statute of limitations begins to run "from the date on which the transportation stopped" or the shipment should have arrived, and is calculated according to the law of court to which it is submitted.

*HN10*☆At the latest, the limitations period in the Warsaw Convention begins to run once a party with enforceable rights under a carriage contract knows or has reason to know something has gone wrong with the shipment, be it misdelivery, loss or delay. <u>Magnus</u>

Case 3:04-cv-30248-RGS    Document 7-2    Filed 01/19/2005    Page 16 of 16

Get a Document - by Citation - 1988 U.S. Dist. LEXIS 4027                    Page 8 of 8

Electronics, Inc. v. Royal Bank of Canada, 611 F. Supp. 436, 441 (N.D. Ill. 1985); Cf. Gore v. Daniel O'Connell's Sons, Inc., 17 Mass. App. 645, 461 N.E.2d 256, 259 (1984) (cause of action accrues when the "injured party knew, or in the exercise of reasonable diligence, should have known of the factual basis for the cause of action").

Plaintiff concedes it became aware of the loss by April, 1984. Indeed, plaintiff should have been aware by late March, when there was no response to the February 23, 1984 letter, that something had gone wrong with the shipment. The initial complaint was filed **[*15]** on May 6, 1986, but named only Donovan as defendant. The third amended complaint for the first time named Emery as a defendant on October 28, 1986. Even if the claim against Emery related back to the initial claim under Fed. R. Civ. P. 15(c), it would be barred by the two-year statute of limitations period. It must be conceded that "there is an element of arbitrariness here, but that is a characteristic of any limitations period. And it is an arbitrariness imposed by the legislature and not by the judicial process." Schiavone v. Fortune, 54 U.S.L.W. 4692, 4695 (U.S. June 18, 1986).

CONCLUSION

Judgment shall be entered for defendants.

Service: **Get by LEXSEE®**
Citation: **1988 usdistlexis 4027**
View: Full
Date/Time: Wednesday, December 29, 2004 - 9:59 AM EST

* Signal Legend:
- Warning: Negative treatment is indicated
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.